**Magi XXI, Inc., Plaintiff,**

v.

**STATO DELLA CITÀ DEL VATICANO a/k/a The Holy See, Gerald P. Colapinto, and Second Renaissance, LLC, Defendants.**

No. 07–cv–2898 (WFK).

United States District Court, E.D. New York.

Signed May 23, 2014.

Bernard Kobroff, Goetz Fitzpatrick LLP, New York, NY, for Plaintiff.

Sheldon J. Fleishman, New York, NY, for Plaintiff/Defendant.

Robert M. Rosenblith, Rusten Corporate Park, Chestnut Ridge, NY, Frank Thomas Spano, Alexis Haller, Byron H. Done, Hogan Lovells U.S. LLP, David Dunn, Levine Sullivan Koch & Schulz LLP, New York, NY, Jeffrey S. Lena, Law Offices of Jeffrey S. Lena, Berkeley, CA, Nicole Civita, Hogan Lovells U.S. LLP, Los Angeles, CA, for Defendant.

*DECISION AND ORDER*

WILLIAM F. KUNTZ, II, District Judge.

Magi XXI, Inc. ("Magi" or "Plaintiff") initiated this action by complaint filed July 17, 2007. Plaintiff filed a first amended complaint ("FAC") on October 29, 2007. Gerald P. Colapinto ("Colapinto") and Second Renaissance, LLC ("Second Renaissance") (collectively, "Defendants")[1] now move this Court to dismiss the FAC in its entirety on the basis of claim preclusion (*res judicata*) and issue preclusion (collateral estoppel) in light of a prior litigation filed in the Southern District of New York ("*Magi I*").[2] Though the licensing programs and agreements at issue are purportedly different, the acts that induced Plaintiff to enter into both sets of sublicense agreements substantially overlap and involve the same claim or nucleus of operative fact. The allegations Plaintiff puts forward for its breach of contract action similarly overlap. Therefore, the fraud and breach of contract claims are barred by *res judicata*. Plaintiff's remaining claims for unjust enrichment, money had and received, and rescission are meritless and hereby dismissed.

## I. Background

This case arises out of a long-standing dispute involving numerous parties and spanning multiple litigations, but the matter before the Court is now limited to Plaintiff and Defendants Colapinto and Second Renaissance. FAC at 1–2. On July 18, 2001, Plaintiff entered into seven sublicense agreements ("Library Sublicenses") with Defendants that gave Plaintiff the rights to sell certain categories of products that making use of Vatican State intellectual property rights. *Id.* ¶ 24–27. These sublicenses conferred the right to

---

**1.** In 2010, Defendant Stato Delia Cita Del Vaticano a/k/a The Holy See ("the Vatican State") successfully moved to dismiss the claims against it. Dkt. 112. The Order of dismissal was affirmed by the United States Court of Appeals for the Second Circuit on April 30, 2013, 714 F.3d 714 (2d Cir.2013). Docket No. 12–568–cv.

**2.** Magi filed its third-party complaint in *Bangkok Crafts Corporation v. Capitolo di San Pietro in Vaticano*, 03–cv–00051 (RWS) under its former name of E21 Global, Inc., but will be referred to here as "Magi" for clarity.

produce and market lines of merchandise inspired by items in the Vatican Library Collection, which included use of the name, logo, and seal of the Vatican Library Collection. *Id.* ¶ 24.

Prior to signing the July 18, 2001 agreement, Defendant Colapinto made numerous representations to Plaintiff that purportedly induced Plaintiff into entering into the sublicense agreements. *Id.* ¶ 27. These included representations that: "the Vatican Treasury licensing program was valid and in good standing; Colapinto and [Second Renaissance] had a strong working relationship with officials at the Holy See; each of the licensing programs was well managed and supported by the various agencies or instrumentalities of the Holy See; each sublicensee would have access to thousands of commercial quality images of the respective artwork which could be used for product development; and each sublicensee would have reasonable access to the respective artwork for research and product development purposes." *Id.* ¶ 27.

Plaintiff specifically alleges in its fraud claim ("Fraudulent Representations Made By All Defendants To Induce Magi To Enter Into Seven (7) Sublicense Agreements") that during negotiations for rights to the Library Sublicenses, Defendants "made numerous representations to [Claire] Mahr in order to induce Magi to enter into the Magi Sublicenses." *Id.* ¶ 37. One such instance was a May 1999 meeting where "Claire Mahr, the President of Magi, Neville Hockley and [Defendant] Colapinto met at the Grand Hyatt in New York City." *Id.* ¶ 37(a). At this meeting, Defendant Colapinto made numerous representations including that Colapinto "had a very close relationship with representatives and officials of the Holy See" and thus he "would be able to assist sublicensees in obtaining images from the Holy

See of its artwork to be used for product development and would be able to arrange for sublicensees to access the Holy See's artwork to obtain their own images for product development." *Id.* ¶ 37(a)(i). Defendant Colapinto allegedly advised Plaintiff that he had been awarded the master license for the Vatican Library, which meant he would be in effect running all of the Holy See's licensing programs and therefore have substantial clout with the Holy See and be able to obtain reasonable access to the Holy See's artwork and representatives. *Id.* ¶ 36.

There were several other occasions where Defendants made representations that Plaintiff relied on in entering into the sublicense agreements, including a December 1999 meeting at the Convention Center in Anaheim, California, *id.* ¶ 37(b); a telephone conversation on August 2, 2000, *id.* ¶.37(e); another telephone conversation on August 19, 2000, *id.*; a September 13, 2000 meeting at the Grand Hyatt Hotel in New York City, *id.* ¶ 37(f); a September 14, 2000 meeting with the Knights of Columbus in Connecticut, *id.* ¶ 37(h); a September 14, 2000 meeting at the offices of "KSH" in Great Neck, New York, *id.* ¶ 37(j); and two more meetings in New York City, on January 29 and 30, 2001, *id.* ¶ 37(m).

After these numerous meetings and telephone conversations, Plaintiff ultimately entered into agreements for the Library Sublicenses on July 18, 2001 for the following product categories: candles, chocolates, confections, flowers, stamps, wrapping paper/gift bags, and fundraising. *Id.* ¶ 26. The sublicense agreements bound Second Renaissance to assist Plaintiff in obtaining images of and access to the Vatican Library Collection artwork. *Id.* ¶ 70. In consideration for the sublicense rights, Magi paid a total sum of $425,000 in advance royalty payments to Second Renais-

sance. *Id.* ¶ 29. Additionally, in November 2001, Plaintiff obtained $500,000 and later another $700,000 in financing in reliance on Defendant Colapinto's numerous alleged misrepresentations. *Id.* ¶ 48–49.

However, soon after signing the agreement, Plaintiff encountered difficulty obtaining the images and Library access it was promised. On December 11 and 12, 2001, Plaintiff's representatives were supposed to meet with Defendant Colapinto at the Vatican Library to gain access to the artwork, but no commercially usable images were made available to Plaintiff and it was granted no access outside of the tour offered to the general public. *Id.* ¶ 73. After repeated attempts to obtain the commercially usable images of and access to the artwork it was promised, Plaintiff finally informed Defendants by way of a letter dated October 23, 2003 that it was ceasing all business with Defendants on account of the difficulties. *Id.* ¶ 75–83. Nearly four years later, Plaintiff filed this action. Dkt. 1.

### *The Southern District Litigation*

All parties to this case were involved in a prior litigation in the United States District Court for the Southern District of New York. That action involved sublicense agreements to the Vatican Treasury Collection, as opposed to the Vatican Library Collection. *Magi I* Seconded Amended Third–Party Compl., Def's Br., Ex. 2 (hereinafter "*Magi I* Compl."). In that case, Plaintiff was a third-party plaintiff (operating under the name "E21 Global, Inc.", *see* n. 2 *supra* ) with claims originally filed on September 7, 2004 against Defendants Colapinto and Second Renaissance as third-party defendants. *Magi I,* Dkt. 98. Plaintiff then filed its second amended complaint on August 19, 2005. *Magi I,* Dkt. 222. Plaintiff alleged causes of action against Defendants for fraud and negligent misrepresentation, where Plaintiff alleged

it was denied the images of and direct access to the Vatican Treasury Collection artwork. *Magi I* Compl. at 7, 48. The case proceeded to a jury trial occurring between March 31, 2008 and April 8, 2008, and at the close of Plaintiff's case the Honorable Robert W. Sweet granted a directed verdict to Defendants pursuant to Rule 50(a). *Magi I,* Dkt. 333. Plaintiff appealed the decision to the Second Circuit Court of Appeals, which affirmed the District Court's decision by summary order. *E–21 Global, Inc. v. Second Renaissance, LLC,* 360 Fed.Appx. 172, 175 (2d Cir.2009). The Court of Appeals upheld the District Court's holding that Plaintiff's fraud claim could not stand because it failed to show clear and convincing evidence that Defendant Colapinto had knowledge that his representations were false or that he had reckless disregard for the truth thereof. *Id.*

## II. Discussion

### A. Standard of Review

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).; *In re NYSE Specialists Secs. Litig.,* 503 F.3d 89, 91 (2d Cir.2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked

by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Id.*

### A. Fraud Claim

 Defendants argue the doctrines of *res judicata* and collateral estoppel preclude Plaintiff's fraud claim. *Res judicata* and collateral estoppel are ordinarily pled as affirmative defenses and thus neither will typically serve as the basis for a pre-answer motion to dismiss. However, "[i]t is well established that a district court may rely on matters of public record in deciding a motion to dismiss under Rule 12(b)(6)." *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 75 (2d Cir.1998); *see also Michaelesco v. Estate of Richard,* 355 Fed.Appx. 572, 573 (2d Cir.2009) (holding there was no merit to plaintiff's position that the defense *of res judicata* is not properly raised on a motion to dismiss) (citing *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir.1992)). The relevant records from *Magi I* are a matter of public record of which this Court takes judicial notice. Based on those records and the FAC now presented, *res judicata* bars Plaintiff's fraud claim against Defendants Colapinto and Second Renaissance. The current fraud claim could have been presented in *Magi I* because the core factual events underpinning the fraud claim there supply the factual basis for the fraud claim alleged here. Having found that *res judicata* bars Plaintiff's fraud claim, the Court need not, and does not, address its collateral estoppel argument.

### Res judicata

 The doctrine of *res judicata,* or claim preclusion, applies in "later litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *EDP Med. Computer Sys., Inc. v. United States,* 480 F.3d 621, 624 (2d Cir.2007) (quoting *In re Teltronics Servs., Inc.,* 762 F.2d 185, 190 (2d Cir.1985)). If those elements are met, a "final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Saud v. Bank of New York,* 929 F.2d 916, 918–19 (2d Cir.1991) (quoting *Federated Dep't Stores, Inc. v. Moitie,* 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). *Res judicata* acts as a bar "not only as to what was pleaded, but also as to what could have been pleaded." *In re Teltronics Servs., Inc.,* 762 F.2d at 193 ("New legal theories do not amount to a new cause of action so as to defeat the application of the principle of res judicata."). "It must first be determined that the second suit involves the same 'claim'-or 'nucleus of operative fact'-as the first suit." *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir.1997). In order "[t]o ascertain whether two actions spring from the same transaction or claim, we look to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations." *Waldman v. Vill. of Kiryas Joel,* 207 F.3d 105, 108 (2d Cir.2000) (quoting Restatement (Second) of Judgments § 24(2) (1982)) ("a plaintiff cannot avoid the effects of res judicata by splitting his claim into various suits, based on different legal theories") (internal quotations omitted).

■ Plaintiff "agrees that the first three elements of [the *res judicata*] analysis exist." Pl's Opp. Br. at 9. Therefore, the parties' dispute centers on the fourth element-whether *Magi I* involved the same cause of action as the case at bar. Plaintiff states that it pled fraud as a cause of action in *Magi I*, but that it now pleads fraud *and* breach of contract, unjust enrichment, money had and received, and rescission.[3] According to Plaintiff, the causes of action pled here are "completely different" from those raised in *Magi I* because these causes of action "involve a different licensing program, with a different licensing entity, with different licensing agreements, for different terms and conditions, executed at different dates and authorized by different Vatican entities." *Id.* at 10.

■ While it may be the case that "[e]ach of [the] licensing programs are separate and unique from the other," *id.*, the relevant question is not whether different rights are being invoked in the second suit, but "whether the same evidence is necessary to maintain the second cause of action as was required in the first, and whether the essential facts and issues in the second were present in the first." *Overview Books, LLC v. United States*, 755 F.Supp.2d 409, 418 (E.D.N.Y.2010) (Vitaliano, J.), *aff'd*, 438 Fed.Appx. 31 (2d Cir. 2011) (citing *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 131 (2d Cir.1975)). *Res judicata* bars claims seeking to enforce rights not brought in a prior litigation when both sets of claims relied on the same nucleus of operative fact. *See In re Teltronics Servs., Inc.*, 762 F.2d at 193. It is in this way *res judicata* bars claims that *could* have been pled in a prior litigation. The fact that a different set of rights is at

issue does not take a claim outside the purview of *res judicata* when the violation of both sets of rights accrue from the same factual predicate.

Because the inquiry is whether the same "nucleus of operative fact" gives rise to both claims, the *res judicata* analysis here turns on whether the facts giving rise to the claim of fraud in *Magi I* are the same facts that give rise to the claim of fraud before the Court now. The operative complaints from the two cases filed by Plaintiff make clear that both fraud claims are based on the same core factual allegations.

In the FAC, Plaintiff's first cause of action alleges "Fraudulent Representations Made By All Defendants To Induce Magi To Enter Into Seven (7) Sublicense Agreements." FAC at 13. During negotiations for rights to the Library Sublicenses, Plaintiff alleges Defendants "made numerous representations to [Claire] Mahr in order to induce Magi to enter into the Magi Sublicenses." *Id.* ¶ 37. The first example Plaintiff gives is of a May 1999 meeting where "Claire Mahr, the President of Magi, Neville Hockley and [Defendant] Colapinto met at the Grand Hyatt in New York City." *Id.* ¶ 37(a). At this meeting, Defendant Colapinto made numerous false representations, according to Plaintiff, including that Colapinto "had a very close relationship with representatives and officials of the Holy See" and thus he "would be able to assist sublicensees in obtaining images from the Holy See of its artwork to be used for product development and would be able to arrange for sublicensees to access the Holy See's artwork to obtain their own images for product development." *Id.* ¶¶ 37, 37(a)(i). Plaintiff alleges these representations were false, Defendant Colapinto knew they

---

**3.** Plaintiff concedes that its conversion claim is time-barred and should be dismissed. Pl's Opp. Br. at 2.

were false, and they induced Plaintiff to enter into seven Library Sublicense agreements. *Id.*

In the *Magi I* Second Amended Third–Party Complaint, Plaintiff references this exact same meeting to prove that it was fraudulently induced into entering into a different set of sublicenses. *Magi I* Compl. ¶ 22(a). Under a section similarly titled "Fraudulent Representations Made By Colapinto, Loata, And BCC/TSV To Induce [Magi] To Enter Into The Internet Sublicense Agreements," Plaintiff employed verbatim language in alleging that the exact same May 1999 meeting at the Grand Hyatt in New York City as the time and place in which Defendants made numerous fraudulent representations inducing Plaintiff to enter into the "Internet Sublicense." *Magi I* Compl. at 7, ¶ 22(a). Plaintiff notes that one of the material misrepresentations Defendants made that induced the agreement was that Defendant Colapinto "had a very close relationship with representatives of the [Holy See] and, therefore, could assist sublicensees in obtaining images from the [Holy See] of its artwork to be used for product development and could arrange for sublicensees to access the [Holy See's] artwork to obtain their own images for product development." *Magi I* Compl. ¶ 22(a)(iii). This is an almost word-for-word description of the representation alleged in the Amended Complaint before this Court. Accordingly, this meeting and the alleged misrepresentations allegedly made during it are factual occurrences Plaintiff relies on in both litigations in order to prove that it was fraudulently induced into entering into sublicense agreements. Although Plaintiff argues that different agreements are at issue, the same alleged misrepresentations are cited by Plaintiff as legally significant facts to prove fraud in both *Magi I* and in this case.

In addition to this prominent example of an overlapping factual allegation, Plaintiff's separately filed complaints reveal numerous others. For instance, both complaints allege Defendants made material misrepresentations at a December 1999 meeting at the Convention Center in Anaheim, California. FAC ¶ 37(b); *Magi I* Compl. ¶ 22(b). Both complaints also allege, with only the mere ordering of the words differing, that Defendant Colapinto advised Plaintiff he had been awarded the master license for the Vatican Library, which meant he would be in effect running all of the Holy See's licensing programs. FAC ¶ 36; *Magi I* Compl. ¶ 32. Defendant Colapinto would, therefore, have substantial clout with the Holy See and be able to obtain reasonable access to the Holy See's artwork and representatives. FAC ¶ 36; *Magi I* Compl. ¶ 32. Again, these factual allegations underpinned the fraud claim in *Magi I* and have been alleged once more in this Court to support the fraud claims here.

Further examples of common operative facts persist. In both complaints, Plaintiff cites the same two telephone conversations—one on August 2, 2000 and the other on August 19, 2000—as instances Defendant Colapinto repeated fraudulent representations to Plaintiff. FAC ¶ 37(e); *Magi I* Compl. ¶ 33(b). Additionally, each of the complaints relies on a September 13, 2000 meeting at the Grand Hyatt Hotel in New York City to support its separate fraud claims. FAC ¶ 37(f); *Magi I* Compl. ¶ 33(c). Plaintiff alleges that Defendants made further fraudulent representations inducing it to enter into the sublicense agreements at a September 14, 2000 Knights of Columbus meeting in Connecticut. FAC ¶ 37(h); *Magi I* Compl. ¶ 33(e). Plaintiff cites another meeting in both actions, this one occurring on September 14, 2000 at the offices of "KSH" in Great Neck, New York, as another specific occa-

sion where Defendants allegedly made misrepresentations. FAC ¶ 37(j); *Magi I* ¶ 33(f). Yet again, in each lawsuit Plaintiff points to two meetings in New York City, on January 29 and 30, 2001, as specific occasions Defendant Colapinto made further fraudulent representations to Plaintiff. FAC ¶ 37(1); *Magi I* Compl. ¶ 46. Lastly, Plaintiff's complaint in *Magi I* and the FAC here both allege that in November 2001 Plaintiff obtained $500,000 and later another $700,000 in financing in reliance on Defendant Colapinto's numerous alleged misrepresentations. FAC ¶¶ 48, 49; *Magi I* Compl. ¶¶ 48, 49.

With these facts in mind, the Court must determine whether the two causes of action arise from the same transaction or claim. To do so, the Court "look[s] to whether the underlying facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties expectations." *Waldman*, 207 F.3d at 108. Time after time, Plaintiff cites specific meetings and alleged misrepresentations to form the basis of its fraud claim before this Court that it already alleged in *Magi I* to support its fraud claims there. The factual occurrences triggering the fraud claims in both cases are not just related in space, time, and origin—they are almost indecipherable from one another. The overlapping material factual allegations listed above make it "clear that the factual predicate of the claims asserted in this Court are not just 'substantially' identical to those that were asserted before ·the [Southern District of New York], they are in fact entirely identical." *Overview Books, LLC*, 755 F.Supp.2d at 419. Because the same exact factual events are at issue in both cases, it is beyond doubt that "they form a convenient trial unit." *Waldman*, 207 F.3d at 108. And finally, while Plaintiff may have targeted the Treasury Sublicenses as the sub-

ject matter of its first suit, the allegedly false representations that induced Plaintiff to enter into the Treasury Sublicenses were precisely the same representations that induced it to enter into the Library Sublicenses. Therefore, deciding those common facts in one trial unit would undoubtedly conform to the expectations of both parties.

■ The foregoing litany of factual allegations demonstrates there is "a substantial overlap in the core elements of the conduct and actions complained of in the two lawsuits." *Cameron v. Church*, 253 F.Supp.2d 611, 621–22 (S.D.N.Y.2003) (Swain, J.). Where such marked overlap is present, the purpose of *res judicata* is fulfilled in barring claims that should have been brought in one action. *See O'Callaghan v. New York Stock Exch.*, 12–cv–7247, 2013 WL 3984887, at *9–10 (S.D.N.Y. Aug. 2, 2013) (Nathan, J.) *aff'd*, 563 Fed. Appx. 11, 13–3370–CV, 2014 WL 1422395 (2d Cir. Apr. 15, 2014) ("[*Res judicata*] encourages litigants to bring all available claims in one action and prevents them from contesting a matter that they had a full and fair opportunity to litigate in a prior action."). Because Plaintiff's fraud cause of action here involves the same nucleus of operative fact as its fraud claim in *Magi I*, Defendants' motion as to Plaintiff's fraud cause of action is granted on the grounds that the claim is precluded by *res judicata*.

### B. Breach of Contract

In addition to the fraud claim discussed above, Defendants move to dismiss all other causes of action pled in the Amended Complaint. Plaintiff opposes dismissal of these claims on the novel theory that, "[t]o the extent that Defendants attempt to argue grounds other than *res judicata* or collateral estoppel for dismissal of the

FAC, Magi objects to the Court's consideration of any other grounds because of lack of proper notice." Pl's Opp. Br. at 2. Plaintiff received and accordingly responded to Defendants' motion to dismiss, so what could constitute lack of proper notice escapes the Court's imagination. Whatever its rationale, Plaintiff leaves the substance of Defendants' arguments to dismiss the remaining claims unopposed. Nonetheless, rather than accepting Defendants' arguments wholesale, the Court will review each proffered argument to determine which claims, if any, merit dismissal. *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004) (holding district court was required to decide whether movant for summary judgment was entitled to judgment as matter of law even though motion was unopposed).

 Plaintiff brings a breach of contract claim alleging that Defendants committed a material breach by failing to provide it with access to the Vatican Library artwork and commercially usable images of the artwork. Incorporating the *res judicata* analysis above, it is well-settled that *res judicata* applies "not only as to what was pleaded, but also as to what could have been pleaded." *In re Teltronics Servs., Inc.*, 762 F.2d at 193. Significantly, "[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of *res judicata.*" *Id.* When determining whether a claim arises out of the same nucleus of operative fact as a previously adjudicated claim, the court will look to the overlap of material factual allegations, and "the facts essential to the barred second suit need not be the same as the facts that were necessary to the first suit. It is instead enough that the facts *essential to the second* were [already] present in the first." *Waldman*, 207 F.3d at 110–11 (2d Cir.

2000) (internal quotations and citations omitted) (emphasis in original). Moreover, "a plaintiff cannot avoid the effects of *res judicata* by 'splitting' his claim into various suits, based on different legal theories (with different evidence 'necessary' to each suit)." *Id.* at 110 (internal citations omitted).

Plaintiff filed its third-party complaint against Defendants in *Magi I* on September 7, 2004. It then filed its second amended complaint on August 19, 2005. Plaintiff went to trial on its claims between March 31, 2008 and April 8, 2008. As demonstrated at length above, many of the factual events supporting its fraud claims in that litigation were often precisely the same factual events it used to support its fraud claim here. Likewise, in the Southern District litigation, Plaintiff alleged over and over again that Defendants denied Plaintiff the access it needed to commercially usable pictures, there to works in the Vatican Treasury Collection. Here, Plaintiff has made the same functional allegations—that Defendants refused Plaintiff its rightful access to the commercially usable pictures it needed to exploit its sublicenses—to demonstrate that Defendants breached the contract.

This comparison betrays Plaintiff's attempt to "split[ ] his claims into various suits" by basing them on "different legal theories (with different evidence 'necessary' to each suit)." *Waldman*, 207 F.3d at 110 (internal citations omitted). However, the Second Circuit has made it clear that "[n]ew legal theories do not amount to a new cause of action so as to defeat the application of the principle of *res judicata.*" *In re Teltronics Services, Inc.*, 762 F.2d at 193. Plaintiff's fraud allegations sprung from the same factual predicate as the alleged contract breach. Although Plaintiff attempts to facially distinguish the actions by pointing to different subli-

cense agreements, the essential facts are identical—namely, that Defendants denied Plaintiff the commercially usable images of and necessary access to both Vatican collections. In the *Magi I* Second Amended Third–Party Complaint, as discussed above, Plaintiff alleged that Defendant Colapinto represented at the May 1999 meeting in New York City that he would be able to provide Plaintiff the commercial images and Vatican access it needed to exploit its sublicenses, but that Defendants failed to do so. *Magi I* Compl. ¶¶ 22(a), 22(a)(iii). In this case, Plaintiff made the very same material factual allegation to support its breach of contract claim. Plaintiff alleged that Defendant Colapinto made the same promise at the same New York City meeting, and Defendants failed to provide the promised images and access. *Id.* ¶¶ 37, 37(a), 37(a)(i). Even though multiple sublicense agreements may be at issue, the wrongful conduct alleged was the same. Defendants' alleged failure to provide the promised commercial images and Vatican access were facts present and pled in *Magi I,* and thus Plaintiff could have pled its breach of contract claim there.

It would be dubious to suggest that the repeated denials of images and access for each collection occurred within a vacuum. As illustrated above, the basic facts Plaintiff alleged in *Magi I* are in essence the same facts alleged in this case, both as to the events that induced Plaintiff to enter into the agreements and as to difficulties Plaintiff encountered in exploiting its sublicenses. When the core elements of the conduct and actions alleged in the first litigation overlap so substantially with the second litigation here, *res judicata* applies "not only as to what was pleaded, but also as to what could have been pleaded." *In re Teltronics Servs., Inc.,* 762 F.2d at 193. Therefore, Plaintiff's breach of contract claim is dismissed.

### C. Unjust Enrichment

Plaintiff also brings a claim for unjust enrichment. The doctrine of unjust enrichment is a viable form of recovery in equity when a contractual relationship is absent. According to New York law, "[t]he existence of a contract between parties to a dispute ordinarily precludes recovery for unjust enrichment for events arising out of the same subject matter as the contract." *Mars Adver. Europe Ltd. v. Young & Rubicam, Inc.,* 13–CV–0401, 2013 WL 1790896, at *10 (S.D.N.Y. Apr. 24, 2013) (McMahon, J.) (citing *IDT Corp. v. Morgan Stanley Dean Witter & Co.,* 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (N.Y.2009)). The doctrine invokes an "obligation imposed by equity to prevent injustice, in the *absence of an actual agreement* between the parties concerned." *IDT Corp.,* 12 N.Y.3d at 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (emphasis added); *see also Clark–Fitzpatrick, Inc. v. Long Is. R.R. Co.,* 70 N.Y.2d 382, 388, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987). In this case, however, no doubt exists on the face of the pleadings that contractual agreements existed between the parties. Because the *formation and existence of the* contracts—the Library Sublicense agreements—are not at issue and these contracts govern the subject matter of the dispute, the unjust enrichment claim fails as a matter of law. Therefore, Defendants' motion is granted as to the unjust enrichment cause of action.

### D. Money Had and Received

Under New York law, a cause of action for money had and received is established where: "(1) defendant received money belonging to plaintiff; (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be per-

mitted to keep the money." *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat. Ass'n,* 731 F.2d 112, 125 (2d Cir.1984) (citing *Miller v. Schloss,* 218 N.Y. 400, 407, 113 N.E. 337 (1916)). Although it has been recognized as an action in implied contract, the New York Court of Appeals has explained that description as a misnomer, "as it is not an action founded on contract at all." *Parsa v. State,* 64 N.Y.2d 143, 148, 485 N.Y.S.2d 27, 474 N.E.2d 235 (1984). Rather, "it is in obligation which the law creates in the *absence of agreement* when one party possesses money that in equity and good conscience he ought not to retain and that belongs to another." *Id.* (emphasis added). Typically, the cause of action remedies against a defendant "impressed with a species of trust" who has "obtained money from another through the medium of oppression, imposition, extortion, or deceit, or by the commission of a trespass." *Id.* (citations and quotations omitted).

■■■ Here, as discussed above under the unjust enrichment dismissal, a series of contracts clearly control. The money had and received action is intended to apply when there is an absence of such agreements, most particularly when an agent of trust—not a party sitting, at an arm's length, on the other end of a bargaining table—uses some form of oppression or extortion to wrongfully procure the funds. *Barroso v. Polymer Research Corp. of Am.,* 80 F.Supp.2d 39, 42 (E.D.N.Y.1999) (Glasser, J.) (quoting *Parsa,* 64 N.Y.2d at 148, 485 N.Y.S.2d 27, 474 N.E.2d 235). Therefore, Defendants' motion is granted as to Plaintiff's money had and received cause of action.

### E. Rescission

■■■ "[R]escission is an equitable remedy which will not be granted unless Plaintiffs lack an adequate remedy at law."

*New Paradigm Software Corp. v. New Era of Networks, Inc.,* 107 F.Supp.2d 325 (S.D.N.Y.2000) (Berman, J.) (quoting *Mina Investment Holdings Ltd. v. Lefkowitz,* 16 F.Supp.2d 355, 362 (S.D.N.Y. 1998) (Sweet, J.)). A party should invoke rescission "only when there is lacking a complete and adequate remedy at law and where the status quo may be substantially restored ... Where damages appear adequate and it is impracticable to restore the status quo, rescission is inappropriate." *New Shows, S.A. de C.V. v. Don King Prods., Inc.,* 210 F.3d 355, at *2 (2d Cir. 2000) (internal quotations omitted) (citing *Rudman v. Cowles Commc'ns, Inc.,* 30 N.Y.2d 1, 13–14, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972)).

■■■ Here, Plaintiff alleged monetary damages for the money it paid to Defendants. It claims it is owed the $425,000 it paid to Defendants in fulfilling its advance royalty fee obligations under the sublicense agreements, in addition to losses it sustained in obtaining financing in anticipation of the deal. Plaintiff has put forward no reason why damages would not be an adequate remedy. It is clear that "[t]he harm [P]laintiff claims to have suffered is the financial loss it incurred." *Id.* Therefore, the equitable remedy of rescission is wholly inappropriate and fails as a matter of law. Defendants' motion as to the rescission claim is granted.

### III. Conclusion

For the reasons discussed above, the Court GRANTS the Defendants' motion to dismiss. The Amended Complaint is dismissed in its entirety with prejudice. The Clerk of Court is instructed to enter judgment for Defendants and close the case. ***SO ORDERED***